IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


UNITED STATES OF AMERICA,

        Plaintiff,

   v.

KINGSLEY IYARE OSEMWENGIE,

       Defendant.

No. 3:11-cr-00060-HZ-6
(3:15-cv-00764-HZ)

OPINION & ORDER

Billy J. Williams
United States Attorney
Geoffrey A. Barrow
Assistant United States Attorney
U.S. Attorney's Office, District of Oregon
1000 SW Third Ave., Suite 600
Portland, OR 97204

     Attorneys for Plaintiff

Michelle A. Ryan
Law Office of Michelle A. Ryan, LLC
3050 SE Division Street, Suite 225
Portland, OR 97202

     Attorney for Defendant

HERNÁNDEZ, District Judge:

On December 4, 2012, Defendant pleaded guilty, without a plea agreement, to conspiracy to distribute oxycodone and use communication facilities, conspiracy to launder drug proceeds, and conspiracy to violate the travel act. On April 29, 2013, Defendant was sentenced to 210 months in custody. Now, Defendant moves to vacate and correct his sentence pursuant to 28 U.S.C. § 2255, arguing that he received ineffective assistance of counsel.

This is a case about a lawyer with serious professional failings. The Court finds, however, that these failings did not impact the outcome of Defendant's underlying criminal case. Accordingly, Defendant's motion is denied.

## BACKGROUND

### I.  Investigation and Indictment

In January of 2011, the Government obtained authorization to intercept communications between parties suspected of distributing drugs. Gov't. Resp. at 1, ECF 841. On March 17, 2011, authorities searched several properties involved in its investigation, including properties owned by Defendant in Florida and Nevada. *Id*. Defendant was charged in a three-count indictment alleging that he, along with 17 co-defendants, operated the largest oxycodone trafficking ring ever found in the District of Oregon. *Id.*; Third Sup. Indict., ECF 192. Defendant was accused of: (1) obtaining tens of thousands of oxycodone pills and distributing the pills throughout the country; and (2) laundering the proceeds from the oxycodone sales through numerous bank accounts and shell corporations. Third Sup. Indict., ECF 192.

### II.  Retention of Mr. Bertoni as Counsel and Initial Discovery

Defendant's father, Dr. Lantis Osemwengie, was referred to Gary Bertoni by an attorney in Nevada who previously represented Defendant in a separate matter. Def.'s Ex. 101 ("Dr.

Osemwengie Decl.") at ¶ 2, ECF 943-1. Dr. Osemwengie testified that he did not want his son to be represented by a public defender because he was concerned a public defender would do the bare minimum on his son's case. Accordingly, in April of 2011, he retained Mr. Bertoni to represent Defendant for a non-refundable flat fee of $10,000. *Id.* at ¶ 4; Def.'s Ex. 111 at 1–2, ECF 943-13. The fee agreement contained a trial escalation clause that required Defendant to pay $4,000 if the case went to trial. Def.'s Ex. 111. The agreement also provided that, if the case was determined to be a "complex drug case," defined as "a case where discovery, as it pertains specifically to CLIENT, exceeds 10,000 pages," then the flat fee would need to be adjusted to reflect the complexity of the case. *Id.* at 1. At the evidentiary hearing, Mr. Bertoni acknowledged that there were inherent risks involved in flat-fee agreements because cases that take more time generate less income. He testified that there is generally no advantage to having a flat-fee case linger on, especially once the attorney has spent time preparing for trial. The complex case and trial escalation clauses were intended to mitigate that risk.

Before signing the agreement, Dr. Osemwengie questioned the cost increase stipulation in the case of a complex drug case designation. Dr. Oswemwengie Decl. ¶ 3; Def.'s Ex. 112 at 1, ECF 943-14. Mr. Bertoni assured Dr. Osemwengie that "[t]here is nothing about [his] son's case that is extraordinary or that suggests it would be designated a Complex Drug Case." Def.'s Ex. 112. Mr. Bertoni testified that at the time he was negotiating the agreement with Dr. Osemwengie, no discovery had been provided and he had not seen anything indicating the case would be complex. After receiving these reassurances from Mr. Bertoni, Dr. Osemwengie signed the retainer and paid an $8,000 down payment towards the flat fee. Dr. Oswemwengie Decl. ¶ 4; Def.'s Ex. 112 at 1.

On April 11, 2011, Federal Public Defender Steve Wax, defense attorney for one of Defendant's co-defendants, sent a letter to Mr. Bertoni, alerting him of the Government's intention to seek a complex drug case designation.[1] Def.'s Ex. 113 at 2, ECF 943-15. Mr. Wax cited the Government's extensive investigation and over 40,000 pages of discovery. *Id.* In an email to Dr. Osemwengie on April 15, 2011, Mr. Bertoni stated that the discovery would likely be 40,000 pages. Def.'s Ex. 114, ECF 943-16. He clarified that it was unclear how many pages pertained to Defendant. *Id.* Mr. Bertoni did not mention that he knew of the Government's intent to seek a complex case designation. *Id.* A few months later, on August 5, Mr. Bertoni told Dr. Osemwengie that the case had been designated a complex case and asked to renegotiate his flat fee. Def.'s Ex. 117 at 3, ECF 943-19. Mr. Bertoni also informed Dr. Osemwengie that "there is evidence that [Defendant] was engaged in some form of drug dealing during the time frame of this case." *Id.* After some back and forth, Def.'s Exs. 121, 123, ECF 943-23, 943-25, they ultimately renegotiated a flat fee of $16,000, Dr. Osemwengie Decl. ¶ 11, ECF 943-1.

Mr. Bertoni testified that he went through the extensive discovery by hand, and both Mr. Bertoni and Defendant testified that Defendant was provided with a laptop in Columbia County Jail to go through the discovery himself and take notes. They discussed the discovery, and Mr. Bertoni answered Defendant's questions. According to Defendant, Mr. Bertoni told him that there was no "smoking gun" and that they could go to trial. However, Defendant testified that his own review of the overwhelming discovery convinced him that he needed to plead guilty.

On May 12, 2011, a prosecutor for the Government wrote a letter to Mr. Bertoni, addressing the Oregon State Bar ("OSB") investigation of Mr. Bertoni's alleged misuse of funds.

---

[1] The Government moved for complex case designation on April 19, 2011, and the Court granted the Government's motion on May 5, 2011. Mot. Complex Case Desig., ECF 96; Minutes of Proceedings, ECF 125.

Def.'s Ex. 116, ECF 943-18. In the letter, he asked Mr. Bertoni to ensure that Defendant made an informed decision to continue retaining Mr. Bertoni while he was under investigation. *Id*. The AUSA, Mr. Barrow, requested that the discussion happen "in open court." *Id.* Though the record does not show that a hearing occurred, *id*.; Def.'s Corrected Reply at 4, ECF 943, Mr. Bertoni testified that he discussed the status of his bar complaint with Defendant and Judge Haggerty at a court appearance outside the presence of the Government. After having been informed of the bar complaint, Mr. Bertoni's possible sanctions, and the Government's concerns on this matter, Defendant signed a Consent of Representation and Waiver on June 14, 2011. Consent of Rep. and Waiver, ECF 145.

Defendant testified that in April, May, and June of 2011, he met with Mr. Bertoni several times while he was in Multnomah County Jail. After being transferred to Columbia County, it became more difficult for Mr. Bertoni to visit and he saw Mr. Bertoni less often. Defendant testified that he considered Mr. Bertoni a good friend and turned to him for emotional support. He also trusted Mr. Bertoni and left case strategy to him. Initially, Defendant said that he intended to go to trial because he was confused about why he was being charged in Portland when he had never been to Oregon. But in August of 2011, after other inmates in the jail advised him that he should not proceed to trial in federal court, Defendant told Mr. Bertoni that he was interested in a plea.

On August 8, 2011, Defendant wrote Mr. Bertoni and asked that he send a "counteroffer" to Mr. Barrow, indicating Defendant's interest in providing information to the prosecution in exchange for assistance getting pretrial release. Def.'s Ex. 118, ECF 943-20. Mr. Bertoni testified that he began discussing a proffer or "reverse proffer" early in his representation of Defendant. Mr. Bertoni discussed the benefits of cooperating with Defendant and chose this

strategy based on recent experiences where cooperation had proved beneficial. According to Mr. Bertoni, Defendant questioned the strength of the Government's case. Mr. Bertoni hoped that by presenting its case to Defendant, Defendant would be more amenable to cooperating with the Government.

Defendant ultimately attended proffer sessions with the Government on September 15 and 18, 2011. McGeachy Aff. ¶ 6, ECF 842. According to Mr. Bertoni, the Government began the first proffer by discussing Defendant's role in the alleged conspiracy, the law of conspiracy, and the advisory guidelines. Mr. Bertoni testified that this conversation was not inconsistent with the advice that he had given Defendant. While Defendant admitted to his involvement in some of the events presented by the Government, he denied or tried to minimize his involvement in others. Specifically, he maintained that he was not responsible for the conduct charged in the conspiracy, but he admitted to distributing drugs on the East and West coasts. IRS Special Agent Scott McGeachy confirms that Defendant admitted to certain transactions involving oxycodone but minimized the quantities of drugs substantially. McGeachy Aff. ¶ 6. He also recalls Defendant admitting in his proffer that he directed co-defendant Reina Nakachi to engage in certain business transactions and work for him as a dancer or prostitute in exchange for payment of her expenses. Agent McGeachy also said that Defendant did not express interest in resolving the case and denied involvement in the charged conspiracy with co-defendant Olumbenga Badamosi. He described Defendant during the proffer as "defiant."

Though Defendant testified that he went over the proffer agreements with Mr. Barrow, Defendant alleges that Mr. Bertoni failed to prepare him for the proffer sessions with the Government in September of 2011. Def.'s Ex. 141 ("Def.'s Decl.") ¶ 5, ECF 943-40. He claims that Mr. Bertoni advised him to use the proffer sessions as an opportunity to gain information

about the Government's evidence. *Id.* Consistent with the testimony of Mr. Bertoni and Agent McGeachy, Defendant testified that he denied being a member of the conspiracy charged in the indictment at his proffer and admitted buying and selling oxycodone. Defendant also denies directing Ms. Nakachi to engage in drug trafficking, prostitution, or other activities.

Defendant declares that Mr. Bertoni never reviewed the law of conspiracy with him. *Id.* at ¶ 11. Though Defendant admits that the Government explained the law of conspiracy to him at this proffer, he asserts that he did not trust Mr. Barrow. *Id.* The Government suggests that Defendant was familiar with the conspiracy charge because he had a prior federal criminal conspiracy conviction. But Defendant counters that his 2006 conviction for defrauding banks was different than "this drug case [in which he] didn't understand how [he] could be guilty of being a leader of or being in this conspiracy with the codefendants because [he] never dealt with most of the people from the indictment." *Id.*

By early February of 2012, Mr. Bertoni had reached a settlement with the OSB, which provided that Mr. Bertoni would serve a five-month suspension from practicing law, beginning on March 27, 2012. Def.'s Ex. 120 at 653:2–22, ECF 943-22. The Court scheduled a status conference on February 8, 2012, to discuss Mr. Bertoni's upcoming suspension. Sched. Order, ECF 240; Status Conf. Tr., ECF 678.

On February 3, 2012, the Government offered Defendant a plea deal. Gov't. Resp. Ex. 1, ECF 841-1. The plea deal included a sentence of 188 months and expired on March 2, 2012. *Id.* Mr. Bertoni informed Defendant of the plea deal on the day of the status conference, February 8, 2012. Def.'s Decl. ¶¶ 15–18.

Dr. Osemwengie submits a declaration stating that in January or February of 2012, Mr. Bertoni discussed the Government's "14 years sentence plea deal" with Defendant and advised

Defendant to turn the deal down because of the length of the sentence in comparison to the relatively low sentences given to Defendant's co-defendants. Dr. Osemwengie Decl. ¶ 16. According to Dr. Osemwengie, Mr. Bertoni promised to "extract a reasonable plea deal from the prosecutors." *Id*. Defendant similarly declares that Mr. Bertoni recommended that Defendant reject the plea offer. Def.'s Decl. ¶ 16. Defendant asserts that, if he had understood more about the law of conspiracy and sentencing, he would have accepted the Government's offer. *Id*.

Mr. Bertoni testified that he reviewed the plea offer with Defendant. *See also* Bertoni Aff. ¶ 6, ECF 843. Mr. Bertoni had been tracking the cases of Defendant's co-defendants and charting their plea agreement letters. Mr. Bertoni recalls Defendant questioning the Government's ability to prove the quantity of drugs set out in the agreement and bring witnesses to court to prove these quantities. *Id*. Accordingly, they discussed the quantities alleged in the agreement, where the government had obtained that information, and how this impacted the sentencing guidelines. Mr. Bertoni said that he never told Defendant to reject the plea offer. Rather, his practice was to keep an offer open as long as possible, evaluate the plea, and determine whether there was any room for further negotiation.

Defendant was moved to FCI Sheridan, and in February of 2012 he sent a letter to Mr. Badamosi. Gov't Hr'g Ex. 1. The letter states, in relevant part:

> I been through enough shit to film a movie in the past year but I'm goin to trial if not just for the fuck of it cuz this whole shit threw me all the way off. I aint got shit but still got the fam & shorty in MIA. So I'm still straight. Just need to get the fuck outta here. Shinx got another 18 months & Chris and Darnell signed for 10 a piece (damn). These dudes offered me something stupid but I told my lawyer I aint want to hear it. Prolly same as they offered you. I don't know what got these people tryna put me & you as "partners" but they got me fucked up if they want me to sign anything sayin so. Shorty aight too. She still workin in Vegas (barely hittin for anything) but she got her head on straight. I was just up there with Spark at Columbia County & he good too so I ain't stressin, jus waitin for my day in court. Hopefully you'd be able to testify on my behalf.

*Id.* Defendant testified that the purpose of this letter was to let Mr. Badamosi know that he was not going to testify against him and, for his own safety, dispel the rumor that Defendant was a cooperating witness. He was also telling Mr. Badamosi that their mutual friends were doing okay, not that they were not going to testify against him. Defendant contends that was referring to the September 2011 proffers when he said that "these dudes offered [him] something stupid." But Agent McGeachy understood the letter as indicating Defendant was rejecting the Government's plea offer. He also understood Shorty as Ms. Nakachi. Based on his training and experience, Agent McGeachy testified that "got her head on straight" is a reference to Ms. Nakachi not talking to the Government.

At the February 8, 2012 status conference, the Government informed the Court that it had extended a plea offer to Defendant and hoped to have the case resolved prior to Mr. Bertoni's suspension. Status Conf. Tr. 2, ECF 678. But Mr. Bertoni told the Court the case would not be settled before his suspension. *Id.* at 3:3–6. Mr. Bertoni also informed the Court of his plan to provide substitute counsel to Defendant and to resume control of the case after his suspension. *Id* at 3:10–24. He indicated that an attorney who "specialize[s] in federal court matters" would discuss the case with Defendant, and Mr. Bertoni would continue working on the case as a legal assistant by conducting research, interviews, and investigations. *Id.* Mr. Bertoni also stated that he would be reinstated by August and would resume full representation of Defendant in advance of his trial, scheduled at that time for October of 2012. *Id.* at 3:25–4:5. Mr. Bertoni reassured Judge Haggerty that "whoever takes over the case will be able to handle any matters that [were] scheduled" during the suspension period." *Id.* at 4:13–18.

The Court asked Defendant if he had any objections to Mr. Bertoni's plan. Defendant responded that he had "none at all." *Id.* at 4:10. Defendant testified that he was shocked when he

first found out about the suspension but was okay once Mr. Bertoni explained it. However, he would have taken the opportunity to talk to an independent lawyer if the option had been presented to him and if Mr. Bertoni had not been in the courtroom.

### III.   Substitute Counsel

On March 28, 2012, the Court granted Mr. Bertoni's motion to withdraw and substitute Ronnee Kliewer as counsel. Order, ECF 261. Ms. Kliewer stepped in as substitute counsel in a majority of his cases. Def.'s Ex. 136 ("Kliewer Decl.") ¶ 2, ECF 943-35. Ms. Kliewer had not represented clients in federal court before substituting for Mr. Bertoni's cases. *Id.* at ¶ 1. Although Ms. Kliewer was hesitant to accept federal cases, Mr. Bertoni assured her that these cases were "static" and that there were no pending issues to address. *Id.* at ¶ 2. Mr. Bertoni testified that he had discussed his suspension with Mr. Barrow, the prosecutor on this case, and did not anticipate any plea offers or motions during this period.

Ms. Kliewer declares that Defendant was not "fully advised of the circumstances of Mr. Bertoni's suspension" and "was surprised by the substitution of counsel." *Id.* at ¶ 5. Less than a month into Mr. Bertoni's suspension, on April 12, 2012, Defendant and Dr. Osemwengie expressed concern over the new arrangement. Def.'s Ex. 148, ECF 943-47. Dr. Osemwengie emailed Mr. Bertoni because Defendant had been unable to contact anyone about his case. *Id.* Mr. Bertoni assured Dr. Osemwengie that Ms. Kliewer would act as counsel, that he had been in contact with Defendant, and that they were attempting to set up a meeting with Ms. Kliewer and Defendant at FCI Sheridan. *Id.*

Defendant testified that he began questioning Mr. Bertoni after he got in contact with Ms. Kliewer. They discussed the case, and she told Defendant that she had not received the case file yet, did not have the time or specialization to handle his case, and he should find a new attorney.

She did not, however, tell him that he could get a court-appointed attorney. On May 2, 2012, Dr. Osemwengie emailed Mr. Bertoni, voicing concern over Ms. Kliewer's competency. Def.'s Ex. 153, ECF 943-51. Defendant had told Dr. Osemwengie that Ms. Kliewer said that she did not know details about the case, she lacked experience in federal court, and that she did not have all of his files. *Id*. Four days later, Dr. Osemwengie contacted Mr. Bertoni again because of a looming motions deadline. Def.'s Ex. 156, ECF 943-53. He indicated that Defendant's concerns were not being addressed and that Ms. Kliewer would not communicate with Defendant. *Id.* Dr. Osemwengie claims that he tracked Defendant's case on PACER due to lack of communication from Mr. Bertoni. Dr. Osemwengie Decl. ¶ 15. Defendant alleges that he requested a refund so that he could hire new counsel, but Mr. Bertoni told him that the retainer was non-refundable. Def.'s Decl. ¶ 22; Dr. Oswemwengie Decl. ¶¶ 26, 28.

Ms. Kliewer also expressed concerns over her position as substitute counsel in emails to Mr. Bertoni. Def.'s Ex. 150, at 3–4, ECF 943-7. She told him that she was frustrated with the transfer process because she did not have all of the case files from him. *Id*. at 4. Mr. Bertoni testified that he provided Ms. Kliewer a summary of the case. But Ms. Kliewer says that Mr. Bertoni refused to turn over a complete copy of Defendant's file to her. Kliewer Decl. ¶ 7. Without a complete copy of the file, Ms. Kliewer declares that she could not effectively represent Defendant. *Id.* at ¶ 7.

To assist with the difficulties she had in communicating and working with Mr. Bertoni, Ms. Kliewer retained counsel. *Id.* at ¶ 10. On May 9, 2012, Ms. Kliewer's lawyer requested the assistance of the OSB to facilitate the transition of client files from Mr. Bertoni to Ms. Kliewer. *Id.* at ¶ 15. Ms. Kliewer also offered to help find Defendant a new attorney. *Id.* at ¶ 16. After Mr. Bertoni failed to hand over the files within a month of transferring his cases, Ms. Kliewer filed a

complaint with the OSB. Def.'s Ex. 176 at 2, ECF 943-73. She alleged that Mr. Bertoni failed to

provide files and other necessary information for nine cases that Mr. Bertoni transferred to her

for the period of his suspension. *Id.* She named Defendant's case in the complaint—alleging that

Mr. Bertoni withheld files and failed to respond to Defendant's request for a record of previous

payments. *Id.*

During this time, Mr. Bertoni continued to have contact with Defendant and made

arrangements to transfer the case to a new attorney, Robin Runstein. Kliewer Decl. at ¶ 16. On

May 23, 2012, Ms. Runstein replaced Ms. Kliewer as substitute counsel for Defendant, though

Defendant testified that he never agreed to hire her. Notice of Att'y Sub., ECF 313. Mr. Bertoni

asked Ms. Runstein to "babysit" Defendant's case during his OSB suspension. Def.'s Ex. 186

("Runstein Decl.") ¶ 2, ECF 943-83. Robin Runstein had little experience in federal court. *Id.* at

¶ 1 (explaining that, prior to 2012, she had only been primary counsel on one federal criminal

case). Ms. Runstein described her role assisting Defendant as follows:

> The majority of work I did on this matter was to review the case, in part with Mr.
> Bertoni, and field questions from Mr. Osemwengie. More specifically, it was my
> understanding from Mr. Osemwengie and Mr. Bertoni that Mr. Bertoni had
> counseled Mr. Osemwengie prior to my involvement, and that Mr. Osemwengie
> was essentially contemplating his options based on the information and counsel that
> had been provided to him by Mr. Bertoni.

*Id.* at ¶ 5. It appears that Ms. Runstein only met with Defendant once, when she and Mr. Bertoni

visited Defendant in jail to evaluate the decision to plea or go to trial. *Id.* at ¶ 4. According to Ms.

Runstein, Mr. Bertoni spoke for most of the meeting because he was more familiar with the case

details; however, Mr. Bertoni did not give any legal advice and was there as a "legal assistant."

*Id.*

On July 1, 2012, two weeks after she began representing Defendant, Ms. Runstein

emailed Mr. Bertoni and expressed concern about the fact that many of Defendant's co-

defendants had accepted plea deals from the Government.[2] Def.'s Ex. 163 at 1, ECF 943-59. Mr. Bertoni assured her that the Government had agreed to postpone any plea deal discussions until after he returned from suspension. *Id.* He also indicated that Defendant was "presently thinking trial" and that he did not "see a plea happening until the very last second" based on his knowledge of Defendant. *Id.*

During his suspension, Mr. Bertoni talked to Defendant on the phone. Mr. Bertoni testified that he continued to communicate weekly with Defendant, answer questions about the case, and review discovery. Legal questions were sent to Ms. Runstein, as were summaries of Mr. Bertoni's conversations with Defendant. No motions were filed during this time in order to preserve a sentencing reduction. Mr. Bertoni resumed his representation of Defendant on September 24, 2012, after serving his suspension. Order Granting Mot. Sub. Att'y, Sept. 24, 2012, ECF 390.

## IV. Mr. Bertoni's Return from Suspension

In September of 2012, Mr. Bertoni accompanied Defendant to another proffer with the Government. Mr. Bertoni and Defendant remember this proffer differently. Defendant declares that Mr. Bertoni instructed him not to say anything or cooperate. Def.'s Decl. ¶ 29. Mr. Bertoni allegedly told Defendant that the purpose of the proffer was for Mr. Bertoni to find out what the prosecution knew before trial. *Id.* But, according to Mr. Bertoni, the purpose of this proffer was to renew Defendant's cooperation.

The proffer did not go well. Bertoni Aff. ¶ 7. Defendant refused to participate or engage in further discussions. Agent McGeachy testified that Defendant was not interested in moving

---

[2] Eleven of the seventeen co-defendants pleaded guilty by July 1, 2012. Gov't Resp., Ex. 3 at 8–10, ECF 847.

forward with the proffer. *See also* McGeachy Aff. ¶ 7. Mr. Bertoni tesitified that Defendant continued to question whether the Government would be able to gather the witnesses needed and prove the amount of oxycodone at issue. Mr. Bertoni states that he and Defendant had several conversations about Defendant's co-defendants, including Ms. Nakachi and Mr. Wells, and whether they would cooperate based on their plea agreements and posture of the case. Mr. Bertoni shared his concerns about their possible cooperation with Defendant.

The Government offered its second and final plea deal to Defendant on October 9, 2012. Def.'s Ex. 174, ECF 943-70. The plea deal required cooperation with the Government and included a suggested sentence of 161 months. *Id*. at 1. The day before the plea deal expired, all but one of the 17 co-defendants had pleaded guilty. Gov't Resp. Ex. 3 at 8–10, ECF 847-3. Defendant declined the deal. Def.'s Ex. 174. At the end of the agreement, Defendant signed a statement knowingly and voluntarily rejecting the plea offer. *Id*.

Mr. Bertoni and Defendant, again, have different recollections as to their discussions surrounding the second plea offer. Defendant declares that in October of 2012, Mr. Bertoni met with him and said that the Government was willing to give Defendant "two more points off without a new proffer." Def.'s Decl. ¶ 30. Defendant asserts that he never saw the plea agreement letter. *Id.* By contrast, Mr. Bertoni testified that he discussed the pros and cons of the offer with Defendant. As with the February offer, Mr. Bertoni stated that he did not tell Defendant to reject the offer or that he could get the indictment dismissed or beat the charges at trial. Rather, Mr. Bertoni said that he explained to Defendant his right to go to trial and the consequences of going to trial, including his potential sentence without credit and downward adjustments. He testified that he told Defendant he would "get creamed" if he went to trial. Mr. Bertoni believed that Mr. Badamosi was a cooperating witness and shared this with Defendant.

Mr. Bertoni testified that Defendant rejected the offer because he still believed that the Government could not prove the quantities of drugs or conspiracy alleged and that cooperating witnesses would not cooperate or testify as the Government was led to believe.

Defendant and Dr. Osemwengie allege that, throughout the plea negotiations process, Mr. Bertoni encouraged Defendant to go to trial and not plead guilty. Mr. Bertoni told them that the proposed sentence was too lengthy and that Defendant could get a shorter sentence if Defendant went to trial. Dr. Osemwengie Decl. ¶ 16. According to Defendant, Mr. Bertoni told Defendant that the Government did not have substantial evidence to show Defendant's involvement – "'no smoking gun.'" Def.'s Decl. ¶ 32. Prior to either of the plea offers, however, Mr. Bertoni emailed Dr. Osemwengie writing that "there is evidence that [Defendant] was engaged in some form of drug dealing during the time frame of this case." Def.'s Ex. 117 at 3, ECF 943-19.

In November of 2012, after the Government released statements of witnesses to Defendant in preparation for trial, the Government intercepted a letter from Defendant to his brother Kervin. The letter to Kervin included a letter for Defendant's co-defendant Shaun Tyler. The letter to Kervin instructed him not to open it and, if asked, to tell Mr. Tyler "it's a copy of what he said to them peoples. Nothin harmful to me at all but people forget what they say, ya dig??" Gov't Hr'g Ex. 2. The letter to Mr. Tyler included a copy of his proffer and stated:

> If this is what they want you to repeat at my trial zoo ze zamn zing…Hmm? You know anything that's hearsay won't be allowed & Shorty's makin it seem like I was tellin her to hook up with B & others. This is gonna be an all witness trial & if all the stories aint matching up, precisely, it won't sell to a jury. Holla at me!!

*Id.* He denied that the purpose of this letter was to intimidate Mr. Tyler. Rather, he said that he was trying to help the Government prepare Mr. Tyler's testimony, instructing him to "do the damn thing" or do what is best for him by cooperating. Defendant said he sent the proffer so that Mr. Tyler could remember what he said. He was not worried about Mr. Tyler's testimony

because, according to Mr. Bertoni, Mr. Tyler's testimony would not hurt him. Agent McGeachy, however, testified that in sending this letter Defendant was actively working to intimidate the Government's witnesses.

Defendant testified that when Mr. Bertoni met with Defendant in December of 2012, he told him for the first time that he was going to lose if they went to trial because various co-defendants would be testifying against him. He states that Mr. Bertoni urged him to do an open plea, as the Government's plea offer was no longer an option. Def.'s Decl. ¶ 32. Mr. Bertoni told Defendant that he could be sentenced to 20 years if he was convicted at trial, whereas an open plea would result in a 75-month sentence. *Id.* Mr. Bertoni testified that by pleading to the indictment, Defendant could ask for any sentence and retained the right to appeal.

Before the October plea offer, Mr. Bertoni allegedly told Defendant that Defendant's parents owed Mr. Bertoni money. Def.'s Ex. 173 at 5, ECF 943-69. Dr. Osemwengie confronted Mr. Bertoni via email with detailed records of payment, including the increased fee for the complex drug case designation. *Id.* Mr. Bertoni then asked for the $4,000 remaining trial fee, which Dr. Osemwengie paid, even though he later suggested that Defendant plead guilty. *Id.*; Dr. Osemengie Decl. ¶ 38.

Defendant and Dr. Osemwengie describe disputes over payment with Mr. Bertoni on more than one occasion. Defendant alleges that Mr. Bertoni asked Defendant for money and urged him to sell his watch for payment. Def.'s Decl. ¶¶ 14, 32. Emails between Dr. Osemwengie and Mr. Bertoni show Mr. Bertoni urging him to deposit checks directly rather than mail the checks, even after the checks were mailed. Def.'s Ex. 173. Dr. Osemwengie also alleges that Mr. Bertoni insisted he pay him directly even after the IRS instructed Dr. Osemwengie to pay the IRS directly due to Mr. Bertoni's failure to pay taxes. Dr. Osemwengie Decl. ¶ 35. Dr.

Osemwengie claims that Mr. Bertoni threatened to stop representing his son if he did not pay him directly. *Id.*

## V.    Guilty Plea

After Defendant rejected the plea offer, a trial date was set for December 11, 2012. Def.'s Ex. 174 at 5. The Government filed its list of testifying witnesses on December 3, 2012. Gov't. Sur-Resp. at 7, ECF 956; Gov't. Witness List, ECF 506. The list included ten co-conspirators and seven co-defendants, *id.*, some of whom were afraid to testify. That day, Defendant requested a change of plea hearing. Sched. Order, ECF 502. Mr. Bertoni believes that the disclosure of the witness statements played a role in Defendant's decision to plead guilty. At the Change of Plea Hearing, Defendant stated that he had "ample time" to discuss the charges against him with Mr. Bertoni. Plea Hr'g Tr. 6:6–7, ECF 679. The following day, Defendant pleaded guilty to all three counts in the Third Superseding Indictment, without a plea agreement. Minutes of Plea Hr'g, ECF 509.

The Sentencing Hearing was scheduled for April 29, 2013. Minutes of Sentencing Hr'g, ECF 636. Prior to his sentencing, Dr. Osemwengie emailed Mr. Bertoni to express frustration with Mr. Bertoni's lack of communication. Def.'s Exs. 179, 180, ECF 943-76, 943-77. He accuses Mr. Bertoni of failing to return his calls and failing to meet with Defendant. *Id.* Mr. Bertoni, by contrast, recalls meeting a few times in Portland with Dr. Osemwengie and Mrs. Osemwengie to discuss how to present to the court at the sentencing.

The Government filed a sentencing memorandum with three exhibits pertaining to Defendant's finances and property. Gov't Sentencing Mem., ECF 633. The Government recommended a sentence of 210 months. *Id.* The Government argued that Defendant was subject to at least a two-level upward adjustment pursuant to U.S.S.G. § 3B1.1(c) because Defendant

was an organizer and a leader of criminal activity. *Id.* at 3. According to the Government, Defendant "directed his girlfriend, co-defendant Reina Nakachi, throughout the conspiracy." *Id.* Mr. Bertoni filed a sentencing memorandum with 14 letters from community members, friends, and family of Defendant attached. Def.'s Sentencing Mem., ECF 635. In the sentencing memorandum, Mr. Bertoni challenged the Government's proposed aggravating role adjustment. *Id.* at 3. Mr. Bertoni testified that they stipulated to the base offense level of 34 because there was a risk it could have been two points higher. Bertoni Aff. ¶ 13. This base offense level was also consistent with other defendants, including Ms. Nakachi, and he did not believe that Judge Haggerty would agree to a lower base offense level. *Id.*

Mr. Bertoni testified that the sentencing was a "strange event." Dr. Osemwengie and Mrs. Osemwengie both testified from behind counsel table. Mr. Bertoni's impression was that their testimony was not helpful to Defendant. He recalls Mrs. Osemwengie having a "complete meltdown." The Government called Agent McGeachy to testify as to Defendant's role as a leader in the conspiracy. Sent. Hr'g Tr., ECF 680. Mr. Bertoni objected to the aggravated role adjustment for Defendant's alleged role as the leader of the conspiracy. He cross-examined Agent McGeachy on this point, but he did not call any witnesses. Mr. Bertoni argued that Defendant's sentence should be reduced pursuant to 18 U.S.C. § 3553(a), based on lower sentences given to his similarly-situated co-defendants. *Id.* at 47:2–19. During the sentencing hearing, Mr. Bertoni also suggested that upheaval caused by his suspension should be considered as a mitigating circumstance. *Id.* at 48:13–49:22. Ultimately, Judge Haggerty followed the Government's recommendation and sentenced Plaintiff to 210 months. *Id.* at 51:11–17, ECF 680; J. & Commitment, ECF 638. Mr. Bertoni says that he was shocked at the sentence and expressed his concerns to Mr. Barrow.

## VI.    Mr. Bertoni's Legal and Financial Issues

Defendant's trial attorney, Gary Bertoni, was embroiled in OSB disciplinary proceedings, potential criminal prosecution, and financial strain throughout the time he represented Defendant. In February of 2011, two months before Mr. Bertoni began representing Defendant, the OSB filed a complaint against Mr. Bertoni alleging misappropriation of firm and client money. Def.'s Ex. 102 at 2, ECF 943-24 The allegations stemmed from misuse of funds for personal use. *Id.* As a result, Mr. Bertoni was suspended by the OSB for five months from March 2012 to August 2012. Substitute counsel Renee Kliewer eventually filed a complaint against Mr. Bertoni with the OSB, leading to a second OSB investigation and complaint. Def.'s Exs. 175B, 176, 177, ECF 943-72, 943-73, 943-74. Ultimately, Mr. Bertoni stipulated to a six-month suspension. Def.'s Ex. 182, ECF 943-82. On February 1, 2017, in a third disciplinary matter the OSB found that there was substantial evidence to show Mr. Bertoni violated the Rules of Professional Conduct and sanctioned him with a one-year suspension. Def.'s Ex. 184, ECF 943-81.

Mr. Bertoni also experienced significant financial and legal issues throughout his representation of Defendant, and on December 14, 2011, the IRS filed a Notice of Federal Tax Lien against Mr. Bertoni. Def.'s Ex. 131, ECF 943-32. Mr. Bertoni's firm dissolved on December 31, 2011. Def.'s Ex. 130 at 697:1–5, ECF 943-31. On February 22, 2013, the OSB reported Mr. Bertoni's failure to pay taxes to the United States Attorney's Office. Def.'s Ex. 178., ECF 943-75. The Tax Division of the United States Department of Justice filed an indictment against Mr. Bertoni for failure to pay over employment tax on November 18, 2015. Indictment, *U.S. v. Bertoni*, 3:15-cr-00410-SI, ECF 1.

///

## VII.   Post Sentencing

Defendant appealed his sentence, arguing that the Court erred in calculating the base offense and criminal history category. He also argued that the Court failed to explain the sentence adequately and that the sentence was unreasonable. Ninth Circuit Order, ECF 792. The Ninth Circuit affirmed the sentence on June 10, 2014. *Id.* On April 30, 2015, Defendant filed a *pro se* motion to correct his sentence pursuant to 28 U.S.C. § 2255. Def.'s Mot. Vacate, ECF 824. Defendant alleged that Mr. Bertoni was ineffective. *Id.* Defendant later filed a Corrected Reply with the help of appointed counsel. Def.'s Corrected Reply, ECF 942.  On December 3 and 4, 2018, this Court held an evidentiary hearing on Defendant's motion. Minutes of Proceedings, ECF 1003, 1004.

## STANDARDS

Section 2255 permits "[a] prisoner in custody under sentence of a court established by Act of Congress" to move the court that imposed the sentence to vacate, set aside, or correct the sentence on the ground that:

> [T]he sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]

28 U.S.C. § 2255(a). To warrant relief, a defendant must demonstrate that an error of constitutional magnitude had a substantial and injurious effect or influence on the guilty plea or the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also United States v. Montalvo*, 331 F.3d 1052, 1058 (9th Cir. 2003) ("We hold now that *Brecht's* harmless error standard applies to habeas cases under section 2255, just as it does to those under section 2254.").

Under § 2255, the defendant is entitled to a hearing in which the court determines the issues and makes findings of fact and conclusions of law, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255. "The standard for granting an evidentiary hearing [under § 2255] entails assuming the truth of [the defendant's] factual allegations." *United States v. Leonti,* 326 F.3d 1111, 1121 (9th Cir. 2003). When faced with conflicting sworn accounts from a defendant and his trial attorney, a district court is required to hold an evidentiary hearing if the defendant's version of the facts would entitle him to relief. *United States v. Reyes-Bosque*, 624 F. App'x 529, 530 (9th Cir. 2015) (finding that district court erred in holding that the defendant's claim was self-serving because Section 2255(b) imposes no requirement of independent corroboration, and a declaration is not inherently unbelievable merely because it is self-serving). "Therefore, 'a hearing is mandatory whenever the record does not affirmatively manifest the factual or legal invalidity of the petitoner's claims,' and failure to grant one in such a circumstance is an abuse of discretion." *Id.* (quoting *Baumann v. United States,* 692 F.2d 565, 571 (9th Cir. 1982)).

## DISCUSSION

Defendant asserts that he is entitled to relief because: (1) he was effectively denied counsel during Mr. Bertoni's five-month OSB disciplinary suspension; (2) his right to conflict-free counsel was violated; (3) he received ineffective assistance of counsel from Mr. Bertoni; and (4) his Fourteenth Amendment due process rights and Sixth Amendment right to counsel were violated as a result of cumulative errors. This Court disagrees.

Throughout the time that he represented Defendant, Mr. Bertoni faced significant financial and legal problems and was defending himself against multiple OSB disciplinary complaints. Undoubtedly, these issues had an impact on Mr. Bertoni's ability to act as competent

legal counsel. However, on the record before the Court, there is no evidence that Defendant was prejudiced by Mr. Bertoni's representation. Defendant has failed to show that the outcome of plea bargaining or sentencing would have been different, that he was effectively denied counsel at a critical stage by Mr. Bertoni, or that Mr. Bertoni's financial and legal issues created an actual conflict of interest. Accordingly, the Court denies Defendant's motion.

## I.      Counsel Denied at a Critical Stage

Defendant argues that he was effectively denied counsel during a critical stage because, during Mr. Bertoni's five-month suspension, Mr. Bertoni failed to provide Defendant with competent counsel and obstructed the efforts of substitute counsel. Def.'s Corrected Reply 31, ECF 942. In support of his contention that this period constituted a "critical stage," Defendant points to the fact that the majority of Defendant's co-defendants pleaded guilty during this time and substitute counsel, Ms. Runstein, expressed concern about this fact to Mr. Bertoni in July of 2012. Defendant argues that Ms. Kliewer and Ms. Runstein were the functional equivalent of "sleeping lawyer[s]" because they played a passive role in his case due to their inexperience and lack of access to the client files.

"[O]nce the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). "As a general matter, a defendant alleging a Sixth Amendment violation must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Mickens v. Taylor*, 535 U.S. 162, 166 (2002) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). However, the Supreme Court "has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the

accused during a critical stage of the proceeding." *United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984); *see also United States v. Hamilton*, 391 F.3d 1066, 1070 (9th Cir. 2004) ("Where counsel is absent during a critical stage, the defendant need not show prejudice."). "Prejudice is presumed 'because the adversary process itself has become presumptively unreliable.' *Hamilton*, 391 F.3d at 1070.

"A critical stage is any 'stage of a criminal proceeding where substantial rights of a criminal accused may be affected.'" *Hovey v. Ayers*, 458 F.3d 892, 901 (9th Cir. 2006) (quoting *Mempa v. Rhay,* 389 U.S. 128, 134 (1967)); *see also Bell v. Cone,* 535 U.S. 685, 696 (2002) (defining a critical stage as "a step of a criminal proceeding, such as arraignment, that [holds] significant consequences for the accused"). The Ninth Circuit has established a three-factor test to determine what constitutes a critical stage. *Hovey*, 458 F.3d at 901. Courts should consider whether: (1) "failure to pursue strategies or remedies results in a loss of significant rights," (2) "skilled counsel would be useful in helping the accused understand the legal confrontation," or (3) "the proceeding tests the merits of the accused's case." *Id.*; *Menefield v. Borg,* 881 F.2d 696, 698–99 (9th Cir. 1989). "The presence of any one of these factors may be sufficient to render a stage of the proceedings 'critical.'" *Hovey*, 458 F.3d at 901–902.

In this case, the Court finds that the five-month period at issue does not constitute a critical stage. Though Defendant is correct that "the plea process and period of cooperation are critical stages of a proceeding," *United States v. Leonti*, 326 F.3d 1111, 1120 (9th Cir. 2003); *see also Missouri v. Frye*, 566 U.S. 134, 141 (2012), there is no evidence that any plea negotiations or cooperation with the Government took place during the five-month period. Nor does Defendant show that he lost any right to engage in plea negotiations or cooperation, that skilled counsel would have been useful during this period, or that the merits of his case were tested. *See*

*Carrera v. Ayers*, No. 1:90-CV-00478-AWI, 2008 WL 681842, at *8–10 (E.D. Cal. Mar. 11, 2008), *aff'd*, 670 F.3d 938 (9th Cir. 2011), *on reh'g en banc,* 699 F.3d 1104 (9th Cir. 2012), and *aff'd,* 452 F. App'x 741 (9th Cir. 2011), and *aff'd,* 699 F.3d 1104 (9th Cir. 2012), and *aff'd,* 502 F. App'x 643 (9th Cir. 2012) ("While the communication of a plea offer is a critical event requiring the active representation of counsel, the failure to initiate plea negotiations is not a critical event because it is not an adversarial proceeding and does not carry the risk that the defendant's status will worsen."). Indeed, Mr. Bertoni informed Mr. Barrow that he did not anticipate any plea offers or motions during this period, and the Government offered Plaintiff another opportunity to proffer and a more favorable plea offer after the five-month suspension ended.

In support of his argument that Mr. Bertoni's suspension was a "critical stage," Defendant relies on the fact that many of his co-defendants pleaded guilty during this period. Def.'s Corrected Reply 31. Defendant, however, provides no support for the proposition that the plea negotiations of one's co-defendants renders a period "critical" for the purposes of the Sixth Amendment's right to counsel, and this Court has found none. And, again, there is no evidence that the plea agreements of Defendant's co-defendants resulted in the loss of any significant rights for Defendant. Accordingly, the Court declines to find the five-month period during which Mr. Bertoni was suspended a critical stage under the Sixth Amendment.

## II. Right to Conflict-Free Counsel

Defendant argues that he was deprived of his right to conflict-free counsel. "The Supreme Court has held that a criminal defendant has a constitutional right to assistance of conflict-free counsel." *Houston v. Schomig*, 533 F.3d 1076, 1081 (9th Cir. 2008) (citing *Strickland,* 466 U.S. at 688). The test for determining whether an alleged conflict of interest has deprived a defendant

of his right to counsel in violation of the Sixth Amendment was established by the Supreme

Court in *Cuyler v. Sullivan,* 446 U.S. 335 (1980). A defendant must show more than "a mere

theoretical division of loyalties" and "'that a conflict of interest *actually affected the adequacy of*

*[the attorney's] representation.*'" *Pizzuto v. Ramirez*, 783 F.3d 1171, 1178 (9th Cir. 2015).

Specifically, a defendant must demonstrate "that some plausible alternative defense strategy or

tactic might have been pursued but was not and that the alternative defense was inherently in

conflict with or not undertaken due to the attorney's other loyalties or interests." *Hovey,* 458 F.3d

at 908 (quoting *United States v. Wells,* 394 F.3d 725, 733 (9th Cir. 2005)).

Defendant argues that his right to counsel was violated because Mr. Bertoni's personal

and financial interests were materially averse to Defendant and this actual conflict adversely

affected Mr. Bertoni's performance. Specifically, Defendant alleges that Mr. Bertoni had a

conflict of interest due to his financial needs and the fact that the Government was investigating

his failure to pay taxes.

A.  Mr. Bertoni's Financial Interests

Defendant contends that Mr. Bertoni's duty of loyalty was compromised by his financial

interests. According to Defendant, Mr. Bertoni's personal financial troubles led him to focus on

obtaining as much money as possible from Defendant and his family. Defendant argues that, as a

result of Mr. Bertoni's alleged conflict, Mr. Bertoni did not pursue earnest proffers and plea

negotiations and failed to provide competent legal advice. This financial need allegedly led Mr.

Bertoni to encourage Defendant to turn down the Government's plea offers, contrary to

Defendant's best interests. He also argues that this conflict led him to prevent Defendant from

making an informed decision about continuing with Mr. Bertoni's representation.

A lawyer's pecuniary interest typically does not create an "actual conflict" under *Cuyler*. *Bonin v. Calderon*, 59 F.3d 815, 826 (9th Cir. 1995) ("The fact that an attorney undertakes the representation of a client because of a desire to profit does not by itself create the type of direct 'actual' conflict of interest required by *Cuyler*."). As the Ninth Circuit has explained, "[l]awyers almost always undertake representation of clients because of their desire to profit from the representation." *Id.* That said, a conflict of interest claim "may in theory lie where an attorney's financial interests are in conflict with his client's interests." *Williams v. Calderon,* 52 F.3d 1465, 1473 (9th Cir. 1995).

In support of his argument, Defendant cites *Bonin v. Calderon*, 59 F.3d 815 (9th Cir. 1995). In *Bonin*, the defendant argued that his trial attorney had a conflict because he had a financial motive to profit from a prospective literary rights agreement regarding the details of the defendant's case. *Id.* at 826. The court explained that the defendant could not simply show that the interests of the attorney and client "might possibly have come into conflict" but, rather, must show that the interests were actually in direct conflict:

> As human beings, attorneys always have interests of their own independent of those of their clients. Where a direct and significant conflict of interest exists between a defendant and his client, it is reasonable to presume that the defendant has been prejudiced as a result. However, minor or potential conflicts of interest often exist which might theoretically or conceivably affect an attorney's representation, but are not likely to do so.

*Id.* at 826–27.

In a more recent Ninth Circuit case, the defendant argued that the lead counsel in his case fraudulently misappropriated and diverted court-issued funds supplied to the defense, thereby creating a conflict of interest. *Bemore v. Chappell*, 788 F.3d 1151, 1161–62 (9th Cir. 2015). The Court found that, "troubling as these allegations are," they did not support a *Cuyler* claim because fraudulently overcharging the court had "no inherent tendency to dissuade counsel from

loyalty to his client where it counts: in the investigation and presentation of the case." *Id.* The Court went on to explain that, even if the lawyer's use of funds did create an actual conflict of interest, the defendant failed to show that it affected the lawyer's performance or caused him to investigate less thoroughly than he otherwise would. *Id.*

Here, Defendant has failed to show that Mr. Bertoni's financial troubles created an actual conflict of interest. Defendant argues that Mr. Bertoni's financial woes caused Mr. Bertoni to: (1) advise Defendant not to accept plea offers in order to extend the case and extract as much money from Defendant's family as possible; and (2) prevent Defendant from making an informed decision as to whether to stick with Mr. Bertoni or obtain new counsel. Def.'s Corrected Reply 33–36. As explained in more detail below, the record does not support Plaintiff's contention that Mr. Bertoni advised him to reject the plea offers. Rather, Mr. Bertoni testified that he investigated the case by reviewing discovery in concert with Defendant, actively pursued plea offers and cooperation opportunities before and after his suspension, and repeatedly informed Defendant of the difficulties with proceeding in his case and the consequences of going to trial. *See infra* Section III(A). Indeed, despite ongoing conflict with Dr. Osemwengie over the fee agreement, Mr. Bertoni was able to secure a more favorable plea offer after his suspension. In addition, both the testimony and documentary evidence in this case suggest that Defendant had no intention of accepting either plea offer. *See id*. Defendant also chose to remain with Mr. Bertoni despite knowing about his financial and disciplinary issues, and the record shows that Defendant and his family would not have sought the representation of appointed counsel. Thus, Defendant has not shown that there was "some plausible alternative defense strategy or tactic [that] might have been pursued but was not and that the alternative defense was inherently in

conflict with or not undertaken due to the attorney's other loyalties or interests." *Wells*, 394 F.3d at 733 (internal citation and quotations omitted).

Further, the modest flat fee in this case, even with the trial escalation and complex case designation clauses, was unlikely to motivate Mr. Bertoni to extend the case through trial preparation. *See e.g. Kaempf v. Yates,* No. CV 10-02633-PSG VBK, 2013 WL 1858786, at *26 (C.D. Cal. Mar. 27, 2013), *report and recommendation adopted*, No. CV 10-02633-PSG VBK, 2013 WL 1858772 (C.D. Cal. Apr. 26, 2013) ("[T]his Court is not aware of any Supreme Court case which holds that a flat-fee agreement for the services of a private criminal defense attorney, without more, represents a conflict of interest that entitles Defendant to habeas relief."); *see also Williams*, 52 F.3d at 1473 (where the alleged conflict was the payment of investigator or psychiatric services out of counsel's own pocket, the court concluded the defendant had alleged "the same theoretical conflict that exists between an attorney's personal fisc and his client's interests in any pro bono or underfunded appointment case"). Mr. Bertoni had received the full fee for his services, including the trial escalation fee, prior to the October plea offer. Accordingly, contrary to Defendant's argument, Mr. Bertoni had no incentive to prolong the case and advise Defendant to reject the Government's 161-month plea deal at that point. In addition, as Mr. Bertoni testified, early resolution of a case is preferable in flat fee cases.

In sum, the Court does not find that Mr. Bertoni advised Defendant to reject a plea offer, and Plaintiff has not demonstrated a link between Mr. Bertoni's performance and a financial conflict. *See Alberni v. McDaniel*, 458 F.3d 860, 872 (9th Cir. 2006) ("A link between deficient performance and the conflict of interest must be shown."). Consequently, although Mr. Bertoni was suffering financial distress throughout the time he was representing Defendant, the Court

concludes that, on the record before it, Mr. Bertoni's financial interests, at most, represent only a theoretical conflict and not an actual conflict as required by *Cuyler*.

    B.  Mr. Bertoni's Tax Investigation

Defendant also argues that Mr. Bertoni had another potential conflict. Def.'s Corrected Reply 35. In between Defendant's guilty plea and his sentencing hearing, the OSB contacted the United States Attorney's Office about Mr. Bertoni's criminal conduct in failing to pay taxes. Defendant suggests that Mr. Bertoni may have failed to aggressively advocate for Defendant at sentencing in hopes that cooperating with the United States Attorney's Office would help the outcome of his own case.

The Court finds that there is no evidence to raise this allegation from a theoretical conflict to an actual conflict as required by *Cuyler*.  First, the U.S. Attorney's Office was recused from Mr. Bertoni's tax case and the investigation was conducted instead by the Tax Division of the United States Department of Justice. Second, and perhaps more importantly, Defendant fails to provide any evidence that a pending investigation motivated Mr. Bertoni to fail to provide competent counsel at his sentencing. *See infra* Section III(B). Accordingly, the Court finds that Defendant was not deprived of his constitutional right to conflict-free counsel.

## III.   Ineffective Assistance of Counsel

Defendant argues that he received ineffective assistance of counsel during both the plea bargaining phase and sentencing phase of his case. The Sixth Amendment guarantees that "in all criminal prosecutions, the accused shall enjoy the right to . . . the Assistance of Counsel for his defence," U.S. Const. amend. VI. "[T]he right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to

which they are entitled.'" *See Strickland*, 466 U.S. at 685 (internal citation omitted). Therefore, the right to counsel guaranteed in the Sixth Amendment is the right to *effective* assistance of counsel. *Id*. at 686.

The defendant must prove two elements under *Strickland* to succeed on a claim for ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

*Id*. at 687. The Court must analyze counsel's performance considering the circumstances at the time: "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 659.

The right to effective counsel under the Sixth Amendment applies to all "critical stage[s] of the prosecution." *Kirby v. Illinois*, 406 U.S. 682, 690 (1972). The plea-bargaining stage and sentencing stage are critical. *See Leonti*, 326 F.3d at 1117.

A. Plea Bargaining Stage

Defendant alleges that Mr. Bertoni's performance during the plea-bargaining stage was deficient. Defendant contends that Mr. Bertoni failed to investigate Defendant's background for mitigation evidence, failed to communicate with Defendant, and failed to provide reasonably competent legal advice regarding the plea negotiations. According to Defendant, Mr. Bertoni persuaded him to decline both plea deals offered by the Government. The first deal included a sentence of 188 months, and the second deal included a 161-month sentence. Gov't. Resp. Ex. 1,

ECF 841-1; Def.'s Ex. 174. Because Defendant was ultimately sentenced to 210 months without a plea deal, he contends that Mr. Bertoni's actions were prejudicial.

A defendant has the right to effective assistance of counsel to decide whether to plead guilty and when to plead guilty. *See Leonti*, 326 F.3d at 1117 (9th Cir. 2003). "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it." *Lafler v. Cooper*, 566 U.S. 156, 168 (2012). Once the government offers a plea deal, counsel must communicate all aspects of the deal and ensure that the defendant understands the significance of the terms of the deal. *See Leonti*, 326 F.3d at 1117. Failure to communicate a plea deal to a defendant is a gross deviation from professional standards. *See United States v. Baylock*, 20 F.3d 1458, 1466 (9th Cir. 1994); *see also Frye*, 566 U.S. at 149.

"If it is ineffective assistance to fail to inform a client of a plea bargain, it is equally ineffective to fail to advise a client to enter a plea bargain when it is clearly in the client's best interest." See *Leonti*, 326 F.3d at 1117; *see also United States v. Rivera-Sanchez*, 222 F.3d 1057, 1060–61 (9th Cir. 2000) (When the evidence shows that a plea deal is a more favorable option, the attorney should advise accordingly). The defendant bears the burden of proving that their counsel's advice against a plea deal was beyond reasonable professional norms at the time the plea deal was offered. *Leonti,* 326 F.3d at 1120. If counsel can provide a tactical reason for advising against a plea deal, and that reason fits within reasonable professional norms, then they did not act unreasonably. *Id*. (finding that counsel who advised waiting until entire discovery available was a tactical decision within reasonable professional norms given obligation to only advise acceptance of a plea deal after a full investigation of the case is complete). "To establish a claim of ineffective assistance of counsel based on alleged erroneous advice regarding a guilty

plea, a petitioner must demonstrate more than a 'mere inaccurate prediction.'" *Sophanthavong v. Palmateer*, 378 F.3d 859, 868 (9th Cir. 2004) (internal citations omitted).

If a defendant is able to show that counsel's advice to reject a plea deal was deficient, the defendant still must show that counsel's advice prejudiced the defense. *See Strickland*, 466 U.S. at 687. When a defendant alleges that he rejected a plea deal and subsequently pleaded guilty to less favorable terms due to ineffective assistance of counsel "*Strickland*'s inquiry into whether 'the result of the proceeding would have been different,' requires looking at . . . whether he would have accepted the offer to plead pursuant to the terms earlier proposed" absent ineffective assistance. *See Frye*, 566 U.S. at 148 (internal citations omitted). A defendant must show "a reasonable probability they would have accepted the earlier plea offer." *Id.* at 147. If the defendant would not have accepted the plea deal, regardless of their counsel's advice, then the defendant fails to show prejudice. *See Lafler*, 566 U.S. at 172 (explaining that courts may "take account of a defendant's earlier expressed willingness, or unwillingness, to accept responsibility for his or her actions.").

In the present case, Defendant has failed to demonstrate that Mr. Bertoni was ineffective in counseling Defendant on whether to accept either of the plea deals. Mr. Bertoni—whose testimony was generally consistent with that of other witnesses and the documentary evidence in this case—credibly testified that he reviewed each plea offer with Defendant. In discussing the plea offers, Mr. Bertoni and Defendant discussed the potential sentences Defendant faced if he were to reject the offers based on the alleged drug quantities, number of transactions, and absence of any downward departures or credits. Mr. Bertoni went through the discovery with Defendant, and he followed the cases of Defendant's co-defendants closely, including whether they had obtained more favorable plea deals. He advised Defendant "that he had more sentencing

options available to him if he cooperated and negotiated a plea agreement based on his cooperation." Bertoni Aff. ¶ 10. When discussing the second plea offer, he also told Defendant that he believed that Defendant's co-defendants were cooperating with the government and that Defendant would "get creamed" if he went to trial. He testified that did not tell Defendant to reject either plea deal, nor did he tell Defendant he could get the indictment dismissed or win at trial. In other words, Mr. Bertoni advised Defendant to cooperate and negotiate a favorable plea agreement and adequately communicated both plea offers to the Defendant, including the potential sentences Defendant faced and the significance of the more favorable plea agreements of Defendant's co-defendants.

In addition, even assuming Mr. Bertoni's advice was deficient, Defendant has failed to show prejudice. The record suggests that Defendant had no intention of accepting a plea agreement in this case. *See Turner v. Calderon*, 281 F.3d 851, 879 (9th Cir. 2002) ("[T]o satisfy the 'prejudice' requirement, [the defendant] must show that, but for counsel's errors, he would have pleaded guilty and would not have insisted on going to trial."). Both Mr. Bertoni and Agent McGeachy testified that Defendant was defiant during proffers and denied his involvement in the alleged conspiracy. Defendant still maintains that he was not a leader in the conspiracy and Ms. Nakachi was not his subordinate. Mr. Bertoni declares that Defendant was a difficult client and was unwilling to admit guilt or accept consequences. Bertoni Aff. ¶ 4, ECF 843. He said Defendant "was not willing to accept the government's plea offers because he was unwilling to accept the significant sentences that went with the plea offers." *Id*. Mr. Bertoni also states that Defendant rejected the pleas because he believed that the Government could not prove its case and that the Government's witnesses would not cooperate. *Id.* at ¶¶ 6, 8.

The documentary evidence also supports this testimony. First, letters sent to Defendant's co-defendants show that Defendant intended on going to trial in this case and was not inclined to accept a plea offer. In his letter to Mr. Badamosi in February of 2012, Defendant writes "I'm goin to trial if not just for the fuck of it cuz this whole shit threw me all the way off" and denies being partners with Mr. Badamosi as the Government alleged. Gov't Hr'g Ex. 1. He also claims "[t]hese dudes offered me something stupid but I told my lawyer I aint want to hear it." *Id.* Given the timing of this letter, it is likely Defendant was referring to the February 2012 plea offer, as Agent McGeachy suggests, rather than the September 2011 proffer, as he alleges now. Second, there is evidence that Defendant tried to intimidate the Government's witnesses to ensure that they would not cooperate.  Specifically, in the month before his scheduled trial, Defendant sent a letter to Mr. Tyler, along with a copy of his proffer, that stated "[t]his gonna be an all witness trial & if all the stories aint matching up, precisely, it won't sell to a jury." Gov't Hr'g Ex. 2. Finally, the court set a change of plea hearing the same day the Government filed its list of witnesses in preparation for trial. *See* Sched. Order, ECF 502; Gov't Witness List, ECF 506. This lends some support for Mr. Bertoni's belief that Defendant believed the Government's witnesses would not cooperate and that the disclosure of the Government's witnesses contributed to Defendant's decision to plead guilty. Thus, the Court finds that—even if Mr. Bertoni was ineffective—Defendant was not prejudiced as he would not have accepted either plea offer.

B.  Sentencing Stage

Defendant also alleges that Mr. Bertoni's performance was deficient with regard to sentencing.  Defendant alleges that Mr. Bertoni was ineffective because he failed to investigate Defendant's background for mitigating evidence. Defendant was in a car crash in 2007 and consequently suffered frequent migraines. Def.'s Decl. ¶ 39. Defendant was introduced to

oxycodone to manage his pain from his accident. *Id.* Defendant also alleges that Mr. Bertoni

failed to interview his co-defendant, Mr. Badamosi, and his friend, Romel Beck. Def.'s

Corrected Reply 38. Defendant alleges that Mr. Badamosi and Mr. Beck would have provided

testimony that would show he did not control his girlfriend and co-defendant, Ms. Nakachi. *Id.*

He believes their testimony would have refuted the Government's claim that he played a

leadership role and that he controlled Ms. Nakachi.

Counsel has a duty to complete an adequate investigation when preparing for sentencing

stage. *Rompilla v. Beard*, 545 U.S. 374, 380–81 (2005). A proper investigation includes an

investigation "of the circumstances of the case and . . . all avenues leading to facts relevant to the

merits of the case and the penalty in the event of conviction." *Id.* at 387 (quoting 1 ABA

Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)). Counsel must try to obtain all

information that the prosecution might use as evidence for aggravating factors. *Id.* (holding that

counsel erred and prejudiced the defendant by failing to obtain files pertaining to the defendant's

prior convictions used as evidence of aggravating factors). However, counsel's failure to

investigate must be analyzed by considering the circumstances at the time of sentencing and not

in hindsight. *Id.* at 381. By considering the circumstances at the time, the decision not to

investigate need only be reasonable under professional norms, "giving a heavy measure of

deference to counsel's judgments." *Id.* at 380–81; *compare Strickland* 466 U.S. at 699 (counsel

reasonable not to argue emotional distress when aggravating factors outweighed mitigating

factors and judge known to appreciate remorse and admittance of guilt rather than mitigating

factors) *with Wiggins v. Smith*, 539 U.S. 510, 538 (2003) ("[A]vailable mitigating evidence,

taken as a whole, 'might well have influenced the jury's appraisal' of [the defendant's] moral

culpability.").

The Court finds that Defendant has not demonstrated that Mr. Bertoni's conduct fell below the range of professional assistance. First, Defendant fails to demonstrate how the evidence of Defendant's introduction to oxycodone would have impacted his sentence for conspiring in the largest oxycodone distribution ring ever found in this District. Second, there is no credible evidence that Mr. Badamosi would have testified on behalf of Defendant at the sentencing hearing. As noted above, there is some evidence of witness intimidation on the part of Defendant. And, as the Government points out, this sentencing strategy would have been highly unorthodox. Mr. Badamosi, a co-leader in the conspiracy with Defendant, had a cooperation agreement with the Government and has since served his sentence. *See* Gov't Sur-Response 17. It is highly unlikely that, under the circumstances at the time of sentencing, Mr. Badamosi would have made the statements he is now, in hindsight, willing to make. Further, this testimony—and the limited testimony of Defendant's friend Romel Beck—is unlikely to have made a difference for Judge Haggerty in sentencing Defendant given the totality of the PSR and the conflicting assertions of Ms. Nakachi in her proffer as to the leadership role of Defendant. *See* Def. Ex. 197.

At sentencing, Mr. Bertoni also challenged the leadership adjustment. Mr. Bertoni filed a sentencing memorandum in which he argued that the PSR was inaccurate and that Ms. Nakachi was not Defendant's subordinate. Def.'s Sentencing Mem. 3. He also cross-examined Agent McGeachy on this issue. Sentencing Hr'g Tr. 22:15–28:22. In support of his mitigation argument, Mr. Bertoni presented numerous letters attesting to Defendant's character. Def.'s Sentencing Mem. 3. He also argued that the proposed 210-month sentence constituted an unwarranted sentence disparity between similarly situated co-defendants. *Id.* at 9. The fact that Judge Haggerty nevertheless chose to impose a 210-month sentence does not prove that Mr.

Bertoni's assistance was ineffective. Accordingly, Plaintiff has not met his burden under *Strickland* as to the sentencing phase of his case.

## IV. Cumulative Error Doctrine

In the alternative, Defendant argues that the cumulative effect of Mr. Bertoni's errors warrants relief in this case. "In some cases, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996). "Where . . . there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." *Id.* (quoting *United States v. Wallace,* 848 F.2d 1464, 1476 (9th Cir. 1988)). In those cases where the Government's case is weak, a defendant is more likely to be prejudiced by the effect of errors or misconduct. *United States v. Berry,* 627 F.2d 193, 201 (9th Cir. 1980). "This is simply the logical corollary of the harmless error doctrine which requires us to affirm a conviction if there is overwhelming evidence of guilt." *Id.*; *see also United States v. Hibler,* 463 F.2d 455 (9th Cir. 1972). Here, the record demonstrates that Mr. Bertoni was not ineffective and that Defendant was not prejudiced by the alleged actions of Mr. Bertoni. *See United States v. Fernandez*, 388 F.3d at 1199, 1256 (9th Cir. 2004) (Where there was no error, "cumulative error is simply inapplicable."). Accordingly, the Court declines to apply this doctrine here.

///

///

///

///

**CONCLUSION**

The Court DENIES Defendant's Motion to Vacate or Correct Sentence Under 28 U.S.C. § 2255 [824]. A certificate of appealability is DENIED because Defendant has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). The parties shall submit a status report regarding the status of Defendant's Motion for Return of Property [840] within 30 days of this Order.

IT IS SO ORDERED.

Dated this _____ day of _____, 2019.

_____
MARCO A. HERNÁNDEZ
United States District Judge